Carolyn, can you see the podium or should I turn it a little? I think it's the camera. You might be a little muted. I can see it. It looks good. It looks good. Let's get the first one up and then, but I think I can see it fine. Okay, so Judge King is participating and Judge Duncan is to my left. This is our final day for this sitting. I will go ahead and call the first case, 18-41060 Longoria v. San Benito Independent Consolidated School District. Mr. Stapleton. Yes, Your Honor. Thank you. Thank all of you for the opportunity to speak with you this morning. I'm here with Mr. Pettis and he represented the cheerleader and her mom at the hearing. He'll be taking the second portion of this, dealing primarily with tinker and the issues of free speech. What I'd like to deal primarily with is the qualified immunity issue. Now, I urge that under the current status of the law that the school board did and each of the individuals that we presented did understand that there were clearly established rights. Well, how would you, Mr. Stapleton, I mean, you get right to the issue of what's clearly established. So how would you articulate the clearly established law, either from our court or from a robust consensus of circuit precedents that would have guided the officials' actions in this case? I would urge that tinker and Bell out of the Fifth Circuit are the two that have to be looked at. Well, you know, I read Bell recently. That was before I got on this Court. And there are lots of different opinions in that case, but it's pretty clear to me that Bell involves speech that is threatening in some way. It's clearly a — it's threatening speech. That's the rubric that the Court adopted. And this speech seems — not only does this speech seem different because it's more of a vulgarity, lewdness kind of analysis, but also, you know, here we have — we have sort of — we have an extracurricular activity layer on top of it, where we're not talking about kicking students out of school or suspending them. We're talking about their agreement to abide by some kind of constitution to be part of an extracurricular activity. So isn't Bell just sort of not — I'm asking, do you think Bell really provides that clearly established law they need? I think that the lesson from Bell is that if it happens outside of a school context, then the student has free speech rights. But again, the difficulty at the Supreme Court level and at our level is the cases you're In each of those cases, the courts actually upheld the school action. So we'd be having to extract fair warning to officials from something that actually told officials what they did was OK. Well, and in each of those cases, it was something that happened on the campus. The four standards given by Bell — But I'm just going to interrupt because your time's close. The more pertinent cases from our court seem to be Judge Higginbotham's decision in Porter in 04, the violent drawing case, all the way to Jackson, the cheerleader on the bus case. Both times, our court said, you know, these — it's protected speech, but it's not clearly established. Is that correct? Yes. So it may be unhappy in not giving guidance to people, but we seem to be in this sort of frozen state of it's not clearly established. The Third Circuit's taken the next step and said it's established. Is that fair to say? I believe so, yes, Judge. But what I would urge is that at some point, we've got to get some guidance. At some point. But that itself is conceding your client's position. No, I would say it's not. I would ask that the court to consider Justice Thomas's concurring opinion where he says, hey, this standard for qualified immunity does not work at all. Also, Justice Sotomayor and Ginsburg take that position. Right. But we've had some battles on our court about that. That's not for us to do, to revisit the whole qualified immunity methodology. Well, if you reject our argument on that basis, then perhaps we can revisit it ourselves. Let's assume you're right. And in Porter, we did say it's indisputable off campus that isn't directed at or doesn't substantially disturb. So you're right that it is clearly established. What about my colleague's question of where's the case that says that's true for an extracurricular activity that by its nature is off campus, but it's a school activity traveling around? First, we would say that's not the case here. Well, well, there's there is an extra. This is an extracurricular activity, right? Yes, but but she was not engaged in cheerleading like the case with the banner in Alaska where right now for Jesus, she was on a Facebook privately and posted likes. What about they cite their principal authority that there isn't much law that an extracurricular coaches discipline? They cite the Wildman case, the Eighth Circuit Wildman. Do you have a response to that? I don't judge. I don't think that the we argued in our briefing that cheerleading activity is protected because of both liberty and property rights. And we know that there we weren't able to do discovery in this case. We're much limited because it was cut off before that. But so the whether or not there was a motive that was improper in doing this. But what what we would say is that cheerleading is like gymnastics or football playing as a is a big deal. Yes, it's a big deal. And and it impacts future. Let's say let's say in football, a player does utter profanity, at least in soccer. That's a red card. I would assume the coach could say, all right, I'm going to discipline you. You're actually just put us down a player on the field. I think that's true. Oh, on the field or in a rally. Those are all her Twitter bio does say I'm a I'm a cheerleader. Does identify herself as that. But it's it's absolutely outside of any kind of school context. There's no no rally going on. There's no it's not. And every one of the other cases cited in Bell involves something that happened during a school activity and the vulgarity one especially, which I think is where you were Justice, you're looking at the vulgarity in that case was it was from a nomination at a at a school function. Time at the Fraser. Yes. And Fraser. And so basically what we would say is all of a sudden, if you cannot exercise free speech rights for students and of course, that's perhaps you never can. But then the issue comes up, I would say, with Thomas talking about, well, let's try to wrap it over. Yes. Thank you, Mr. Pettis. I know you divided time, but thank you. The argument we had, the argument. Good morning, morning, morning, may please court. My name is Matt Pettis and I was going to be addressing the First Amendment issues in this suit. Are you going to be talking also about the municipal liability part? No, no, Your Honor. I was going to talk on the issues of that. This was not at least respond to the claim that this would not protect the speech. OK. As the court's aware, this suit arises from a student who was an extracurricular activity, who signed on to a contract to participate in this extracurricular activity. And that contract provided in part that we know the facts and your time is very short. OK, thank you. So as the court is aware, there were several posts that were made by the student who because of those posts, she was she was punished. So and we do consider the fact she was removed from this extracurricular activity as a form of discipline or a form of punishment by the school. What's your best case for that, that a coach, a coach discipline in an extracurricular activity? And this one, the record reflects they traveled to London. The coaches can't can't discipline for profanity. Yes, I would say that while they're in while the student would be in in the in the form of local parenthesis of the school, of the coach, I believe that school through its discipline. But as the court is aware, all of these incidents involving the student occurred while she was at home, using her home computer, texting and those are liking. I'm sorry, it's not the gatehouse to the school. You're saying the school would still extend when the cheerleader group is doing its events or goes to London, but it doesn't when it's in its home. Is that the argument? Yes, your honor. And what's the case that describes this moving school concept, but home still the in part that may control would be the Porter case in the Porter case, as the court is aware, it was a sketch that was drawn by a student who had no intent for it to ever be coming to school. And two years later, his younger brother inadvertently brought the sketch to school and it depicted some kind of horror at the school. And so there it was found that because even though it came onto the school, it depicted the school, it depicted some kind of I imagine massacre at the school. The court held that it was the intent at that time that that that document was or sketch was never to show up in school and that that was the controlling factor in this case where it was up. Morse is a strong case for you, too, right, because the Supreme Court says Fraser vulgarity doesn't go off. Correct. That's correct. But in Morse, it's interesting that the one circuit decision cited for the uncertainty in the law is our Porter decision. Yes, that's correct, Ron, but so if Porter in 2004 is making it clear that the stuff in the home is protected, why would the Supreme Court be citing Porter is uncertain about the law? I'm not I'm not sure why they would be citing it. But but I do think that one of the holdings in Porter, which I think is is it should be controlling is considered controlling is is that it says you look at the intent, you look at the intent of the speaker in determining whether the off campus speech being addressed is subject to a tinker analysis. And so I think obviously each case is a case by case determination. But I think you have to look at the speaker's intent when it's and of course, Porter and Bell are addressing the issues that occur off campus away from a school function. Not that it is the intent of the speaker. I would have thought it would be what's a reasonable here, the true threat context for Bell. I thought the analysis is would the school reasonably have felt these were threats coming back in? Well, but I believe I believe that we have Tinker and then courts have carved out some exceptions to Tinker Bell being one threatening conduct. There's the Hazelwood exception for school sponsor speech. The Moore's exception involving drug use and and harm to students. But in but that goes those were on campus incidents. And that goes to how to take the context of the speech that was being made by the student here. We have in this case, we have first we have off campus. So we're outside of the of the of the schoolhouse gate. Local parentis should no longer be an issue because the child is now back at home with the parents. What what could she have said on the social media site that you would agree she could be disciplined for? Or would you say anything goes? Well, let's say obscenity. Well, Your Honor, the little distinction in this case is that if you look at the post, she never said anything. She just liked. And in fact, in fact, if you look at all the posts, there was only one post where there was a question asked, did Pope split you in half? And all she said was, yes. Well, my last hypothetical, let's say the coach does see it. And then right at the top of her bio, it says San Bernadino cheerleader and she's a captain. And she and the coach then says, take that down. Let's say she refuses. Well, improper to discipline, she's in her home, but they've noticed she's got the association with the cheerleading and they don't want the N word and profanity anywhere near their organization. If she refused, would they be able to discipline her? Well, I mean, following your scenario, Your Honor, I believe that if she's directed to take it down and she complies, then then I think we're OK. But it doesn't comply. But if she's asked to take it down and she refuses to comply, then I think I think we have a different issue. Where does it where does that cut? Does that cut in favor of the school and being a legitimate exercise of authority? If she said, hey, look, we don't want the captain of the cheerleading squad having this stuff up here about somebody's sexual activities with some guy. Well, you can understand why the why I don't want the captain of the cheerleading squad or the captain of the football team talking about that on social media that everybody can see. But I think we're talking about we're talking about at what point can the school interfere with the parental rights or what a parent would allow? I think the school could have said take down the fact that you're the head cheerleader off your off your page. Isn't that effectively what the how do you understand the policy at issue here? The Constitution. What is the Constitution saying? I don't see it. I see it quoted in snippets, but I don't see you know, I don't see like a paragraph from the Constitution. I don't see the Constitution. What do you understand it's saying? Well, the the Constitution was very vague. It just but essentially I think essentially what the Constitution was driving at was that they expected a high level of behavior of moral behaviors and standards from their participants in their cheerleading program. That's the gist of the Constitution. No inappropriate social media posts. That's about as much as I can get out of the. Yes. And it's very vague. It just says that they will make sure that their social media posts are are are appropriate. So my understanding is you've got this standard. You call it vague. You know, OK, it's open ended and no inappropriate social media posts. We don't have that being applied to a student who's engaging in, say, political speech. Right. The student that the student's not going to get taken down because she's she's pro Elizabeth Warren for for Democratic candidate. Right. That'd be a different case. Right. It's not for posting a Bible verse on, you know, some Bible verses. Somebody might find offensive. Different case here. It's lewd sexual conduct. You lewd sexual speech. I mean, do you think that a school has an interest in policing that? I'm not saying it overcomes the First Amendment rights, but I mean, I think we start getting into I mean, that opens another door as to what what's lewd and obscene. I mean, one of one of the violations was that this young lady, when she posted like it, had the picture of the middle finger, which is protected speech. So and again and again, and I think the distinction here is she never actually wrote any of the words that you would say are profane. I mean, one of the profane terms that attributed to her is that there was an acronym in LMAO and that was considered profane. And that's just the acronym LMAO. That's all that was written. But she didn't write it. All she did was she liked she she expressed an agreement with a Senate with a sentiment. I mean, there was one about the Texas is a great estate and there was an F word in there. She liked it. And and and so our argument is that she agreed with the sentiment. But that doesn't mean that she was being profane or vulgar. You have rebuttal time. I think your red light's on. Oh, yes. A little light. Yeah. Yes. Thank you for your attention. Good morning. May it please the court. Your honors have already keyed up the issue in this case from my perspective, which is whether or not a coach of a voluntary extracurricular activity activity can enforce a team manual that the team and team member and her parent agreed to that prescribed a higher standard of conduct and that the only discipline that was inflicted upon her was regarding the participation in that team. And the Supreme Court for half a century has been quite clear and Tinker seems alive and well that government officials aren't going into people's homes to say this is appropriate speech or not. And students get protection in their homes. That's for the parents. And we reiterated that almost every single judge in our court in the majority in Bell. So why isn't it clearly established that it indisputably that was the word in Porter? Yes, your honor. I would assert that this is not a Tinker case. Even the Bell opinion, Judge Barksdale's majority opinion began from the premise that students cost students do not lose their First Amendment rights. And that to me, that's a student case. This is a cheerleader cheerleader case. Oh, so the distinction you're drawing is extracurricular cheerleader does not equal student. Yes, your honor. It would not be my position, but the only case you gave us for that is the Eighth Circuit decision in Wildman. Your honor, I think I also cited to the Sixth Circuit case of Lowry versus Uverard, which cited to that Wildman case. It reduces to Wildman. But I looked at that closely. It's short there. If I remember, the only discipline was the student didn't get a participation award. No, your honor. I believe the Lowry versus. No, I'm talking about Wildman that's cited as the first authority in this sequence. I that that could be accurate. And then in that case, the court emphasized that participants have to respect their coaches. But the only authority cited was Proverbs. It was a biblical authority. Is that correct? Your honor, I don't remember. I feel that it was a little bit more explicit. Explicit. Was there any authority other than the Bible for the notion that there has to be respect? Not in the Wildman case. OK, but that's what I'm focusing on, because that's the original case. And the the case they distinguish is the Tenth Circuit case that if you're a football player. And you're off the football team with the Tenth Circuit case, the Siemens case. Yes, your honor. The facts in that case, I think, make it clearly distinguishable where that the child reported a sexual assault and was then kicked off the football team. I mean, that's that's political speech. That's that's reporting a crime. I think that's clearly distinguishable. OK, but your point to me at the beginning was this. The whole world that's different is coaches v. students. And then the author now you're saying, well, that can be true enough if the speech is important enough. Political speech. No, your honor. My point I was hoping to get to was that this case, when students are participating voluntarily in extracurricular extracurricular activities, should possibly be considered more analogous to government employees, which the Sixth Circuit discussed in Lowery v. Overard, which looks at a sort of a contractual agreement that the student agrees to participate. I didn't see this in your brief. This is the argument. So these students in their homes that are sort of using teenage banter are equivalent to government employees for purposes of their voluntary participation in a government program. What did you elaborate this in the brief? The government employee. Apparently not as well as I should. Well, no. Did you elaborate it at all? Government employee. The analogy is that these are government employees. No, your honor. If you didn't see it, then I didn't do it. No, it's not whether I saw it. It's just you know what you wrote. It's just a shift in argument. I my gut is that maybe start with distinct for my for my benefit. Distinguish the Porter decision. It looks to me like this is like the kid in the home that does a violent drawing. Yes. And then our court says as long ago as 2004, it is indisputable that we don't want government officials, school officials. Censoring or reprimanding for something that parents should be doing, your honor, I would just assert to you that the goals and aims of a cheerleading squad are vastly different from the marketplace of ideas that needs to be. But just because she's a cheerleader squad member doesn't mean that allows the government officials to sort of monitor her private behavior. She wasn't cheerleading in her home when she did this. No, your honor. But cheerleaders are selected for principles of leadership and representation. And that's why they have handbooks that include demerits for things like hair bows, because they understand that they are being selected to represent, to perform in lockstep, to wear a regimented uniform. It's an it's an honor and a privilege. And it's a representational one. And I think that that makes the right. But it's an honor and a privilege to put on a football uniform. I don't. But but it doesn't then mean you're you you're losing your ability to talk about sensitive or even vulgar things. The I guess the I'm thinking of our en banc bail decision. Judge Jones's and Judge Elrod's separate opinion points out we don't want government officials even monitoring sexual dialogue there. The hypothetical was, let's say they want to talk pro or con same sex marriage. It wouldn't be the prerogative of the government to say we approve or disapprove of that dialogue. Your honor, I would assert that it would not be the prerogative even of a cheerleading coach to address political speech or religious speech, speech that's at the heart of the First Amendment. But that lewd speech by a student who has agreed to be a representation of that student body and who is further. But violent speech. That's the same thing as Porter. You're slipping back. The speech is protected when we say lewd or inappropriate. That's precisely what the First Amendment is protecting. Yes. It's not obscenity and it's not a threat. But I think that the the analysis is incomplete if it doesn't take into account the action by the school district and how different it was in this case. And the fact that she was never removed from the classroom, never placed on suspension, that she was simply removed from the team for violating that team. But what's the test? I thought, you know, the test is, would this chill someone from the speech they've just uttered? Do you accept that as the test? Your honor, I think there are some actions that are that are so de minimis that it wouldn't chill. But you accept the test that it doesn't chill a person of ordinary firmness from the protected speech. Do you accept that as the test? Your honor, I think that has been the test. But in this circumstance, I just advocate that that we consider the contractual relationship at play here. Now, if that if you're accepting that that has been the test is the test is clearly announced as the test, then is your point this was de minimis losing your captainship, losing your member, a cheerleader in Texas? I think that's a pretty big deal. Someone might not speak if they felt they're going to get it all stripped off. Your honor, for the purposes of trying to allow coaches to be coaches and to maintain unity and have efficiency on their team, we argued it both ways. On the one hand, that it's a de minimis action. But on the other hand, that this is sort of a contractual relationship in this court, although it's not a precedential case in the Silsby ISD case, and although it was also decided on other grounds, contemplated that a cheerleader does have a contractual relationship with the school when she voluntarily undertakes that activity. I assume that I could be wrong, that what we're talking about here is whether the speech is protected in the analysis, right? Have you even started talking about qualified immunity of the officials and why we what's your argument on that, about why there wasn't clearly established law? And so and also, and I hope you get to this, as I understand it, there's a municipal liability question as well that's separate from all this. There is, Your Honor. So I don't mean to cut off what Judge Higginson is asking about, but what I understand this colloquy going towards is whether there was a First Amendment claim stated, whether the speech was protected, and that's all well and good. And we may or may not have to reach that, but we this is a qualified immunity case. Absolutely, Your Honor. And so that's our our cross appeal is as to the whether there was a First Amendment violation. And so on those other two points, qualified immunity, municipal liability, we looked at the issues, wrote well-reasoned opinions, and said, under the facts of this case, and we all understand how incredibly fact-intensive free speech cases are, especially in education. What is your response to the argument that it is clearly established that off-campus speech that is not directed to the campus, so it's off-campus, it's not threatening, this is not threatening speech, is is protected speech and therefore students can't be penalized? Your Honor, I think the Bell case fairly clearly left that question for another day. And again, I know I've said this, but I think the discipline that was actually inflicted does very much distinguish this case from those line of student speech cases. I won't belabor the qualified immunity argument because I think after having the magistrate and the federal district judge look at this and say it's not clearly established, it would be sort of a hard sell to say that our cheerleading coach and our principal should have had a better grasp of the free speech analysis than our federal judges did. But I will cite... Should we, it probably helps your client and school districts all over the Fifth Circuit if we actually don't do what we've now done for 20 years and said, well, it's just not clearly established. That gets you into litigation like this. Would you agree with that? Your Honor, it can. I just would urge that any decision on that point take into account the what I think is an important distinction between school discipline and extracurricular discipline and that this may not be the case for that. But to that point, if the court is not persuaded by the argument that this should be more of a contractual analysis argument from the Wildman case and the Lowery cases, I would ask that the court take a look at the district court's opinion. I think it's the only instance in which he did not adopt the magistrate opinion where he said... He said this wasn't tinker? What? No, no, Your Honor. Where he said that, um, basically said that Frazier could never, um, Frazier speech could never qualify under the substantial disruption speech under tinker. Um, I don't think that's a fair reading of the Bell case. And I think it sets up a rule that lewd speech, no matter how disruptive on campus. You'd be comfortable with just mapping Bell onto vulgarity. If it is directed at the school, parroting the principal, the teachers causes disruption, then discipline. Okay. No, Your Honor. For purposes of extracurricular punishment, I would be for purposes of school punishment, I think then tinker, tinker would apply and you would need a substantial and material disruption or invasion of the rights of others. Would you lose if, if your school district were in the third circuit? Um, Your, Your Honor, I, I was under the impression that the third circuit possibly had a intra circuit split. No, the en banc decisions in the third circuit. Okay. Um, there's also a cheerleading off-campus speech case that was decided in the one that I believe is on appeal to the third circuit at this time. So I don't think that I would, especially on the clearly established portion, I would not lose. Not on a clearly established portion. Yes, Your Honor. And, and the Pennsylvania case, district court case did come out differently and, or actually, I'm sorry, it came out the same way on the free speech issue. But again, it is, it is currently on appeal. But back to my question, even if you prevail that it isn't presently clearly established, there isn't fair warning, I assume you'd like us to say what the law is rather than do again, the Porter to Jackson, 20 years of ambiguity that just spawns litigation. Yes, Your Honor. For purposes of school districts all across Texas that have, that would be helpful. And yes, what if we just said Porter is the law? It always has been. And we're going to say it is the law again, if you're doing it in your home and it isn't directed at the school or causing substantial disruption, government officials can't go in and say, this is inappropriate. That's for parents to do. Is that rule okay? It's not when it comes to extracurricular. It's not for extracurricular. Okay. Well, you're consistent in your argument. Yeah. And, and do you, I mean, do you accept the premise of Judge Higginson's question that this is in the home, that that's just clear as a bell? No, Your Honor, I don't. And I think that Judge Costa's concurring opinion in Bell that Judge Higginson joined onto, uh, clearly brings up the internet is everywhere at once, which we are currently experiencing in some format. Um, and especially for teenagers who fully understand, and I think the plaintiff in this case had 500 followers on Twitter. I submit to you that at this point, that might be a low number for a popular student in a large six day high school. Um, and that they understand that, that virtual reality does not stop at some artificial barrier that we erect at the edge of the school campus. Um, and so I, I think that is, is an, an important concern. I think I understand Judge Costa's concurrence. I mean, there's some uncharted waters out there when you're talking about internet, social media, all this stuff. I agree, Your Honor. And I think some of those, especially those third circuit cases that were decided five, six, seven years ago, may have jumped the gun on understanding how the internet was going to impact all of our lives. Um, at that point, students were posting things at home, only accessing them at home or in a computer lab that was tightly monitored by the school district. Nobody had smartphones. And I think that that's a fundamental change in technology, which may need to impact the legal analysis. If I mean, Judge Higginson may have other questions and I don't want to step on that, but if you could discuss a municipal liability in terms of the test, uh, for, I mean, we're at the pleading stage. And so in terms of the, the three part test for establishing municipal liability, or at least plausibly pleading municipal liability for this so-called cheerleader constitution, which frustratingly I don't find anywhere. Absolutely.  At this point, since it's a motion to dismiss, we are hamstrung by what was in the complaint. Um, as to that, the first point, the action by a policymaker, um, no, they're not required to plead the policymaker. Um, don't we know who the policymaker is as a matter of Texas law is the board of trustees and it is the school board and it is beyond clearly established at this point that unless they take action to delegate policymaking authority, that teachers, well, my point, I hear you're saying, but my point is only we don't, we don't know who the policymaker is, right? In terms of Texas law, it's the board of trustees. Absolutely. Okay. So you don't have to plead that. Right. Um, and so your honor, what's not in the pleading is any type of well pleaded factual allegations that show that the school board adopted this cheerleading handbook, had any knowledge of the cheerleading handbook had acquiesced in any way to its, to its use. Um, that's just completely not. Does the grievance policy show that the policymaker, the board of trustees, has ratified constitutions, extracurricular activity constitutions? Yes. Your honor, I think if there were well pleaded factual allegations or evidence in the case that the board had taken action at their. No, no. I'm asking the grievance policy. You know, the grievance policy that we're talking about, it came in on the rule seven pleading. I acknowledge it's not in the, it's not in the complaint, but the grievance policy that basically says, as I understand it, the policy of the district is, is that with respect to district rules or campus rules or extra or extracurricular activity constitutions, the principal has the final decision making authority. Your honor, I think it is specifically limited to just extracurricular activities. Um, and, but even so, um, I would assert that that's pretty clearly a decision making grants of authority, much like the decision making grants of authority from the JET versus Dallas ID, ISD case where the superintendent had final decision making authority, authority as to employee transfers. Um, that did not by that fact, make him a policy maker for the district. Um, and I don't think that the principal in this case was made a policy for maker for the district just because he was the final decision maker as to extracurricular activity complaints. I would also assert that that policy. There's no question from the pleading that the principal Sanchez is the one who's making the decision about the application of this constitution, who knows where it came from, who knows who it's attributable to, but Sanchez is making the decision. He's looking at this and saying, inappropriate social media, you're out. Right. Uh, and in your view, is that pleading that, is that not enough to show delegated policymaking authority for Sanchez? No, your honor. I think this is four square with the JET versus Dallas ISD case and that that's delegation decision making. Decision making, not policymaking. Yes, your honor. And I would further assert that in this case, that policy could not be the moving force behind the constitutional violation because the, despite that policy, the plaintiffs actually met with the superintendent who exists above the principal and presented their complaint in this case and the superintendent denied that complaint. Um, so that policy wasn't an act. What would they have had to plead in your view to connect up the extra, the cheerleading constitution with the district? Your honor, I think they could, if they had well pleaded facts that show that the board had taken action at their meeting to adopt the cheerleading handbook, um, they're required under state law to adopt a student code of conduct. I mean, we have a case called Grodin. I don't remember if it's in the briefing where, um, essentially a spokesperson for the city, uh, made an announcement about a policy that, that may have been the, the crackdown policy in Dealey square. And so if you plead that, then we, okay, we can infer that, well, maybe the, the policymaker came up with this crackdown policy because you just got somebody who's sort of official from the city making it. But do we have anything like that in the, in the pleadings here? No, your honor. The pleadings are devoid of any type of allegation that the superintendent or someone else with that sort of authority to speak for the district asserted any type. What if they pled that? I mean, don't, I think we have a case, maybe Robinson or where it's been posted  Would that be enough to plead? No, your honor. The district websites usually have campus components of those websites and everybody and their dog has the authority to post things about what's going on in their classroom, what's what their team schedule looks like, et cetera. I don't think that that, you know, ipso facto makes it adopted by the school board. I know your, your time is running short. So let me, let me ask you, let me ask you a really complicated multi-part questions. And, um, in this analysis of have them at the pleading standard, with respect to municipal liability, do we have to concern ourselves with whether the policy is facially unconstitutional or adopted with deliberate indifference? Is that part of this analysis? Your honor, I don't think that that was, was pleaded. Um, right, right. I understand that. But do we have to concern ourselves with that, that part of it in order to figure out, well, maybe it's, in other words, ma'am, maybe it was connected enough to the district, but still we're looking at this policy and we don't see that a policy like this, even assuming it was adopted, was done. So with deliberate indifference to constitutional rights, I'm just a little unclear about whether that's part of the analysis. I just don't think that that issue has been in any way raised. It wasn't raised in the district court letter level. It wasn't raised in the planning, pleading, and also wasn't raised in the, in the appellant's brief. Thank you. I would urge, yes, we would like some clear guidelines. Both as to the, uh, uh, the right of a student and free speech and also as to, uh, when, uh, qualified immunity is going to apply, but we have to make decisions on whether we take cases, it's expensive. Uh, and if we headed off by telling people coming in, Hey, you child have no free speech rights. And that of course was the argument, uh, that justice, uh, Thomas made in his concurring was that the Tinker should be reversed. This was in the Morse case. He says, you know, reverse it. And, uh, he, he cited a case out of Vermont Lander versus Seaver from 1859 where student had been disrespectful to somebody, the professor, uh, and called him old Jack Seaver. And, uh, that was enough order, decency, decorum, and good government would permit punishment of that student. Now, if we know that that's the rule, then we can act on it. But what we are, have been told for so long is that under Tinker, and I was in high school when that came out, we, I remember what an issue it was that, uh, we do have free speech rights as students. And, uh, certainly if it's not on campus activity, we should be protected. What about the Vernonia case where somebody on the football team, their, their fourth amendment rights are somewhat, somewhat, uh, qualified because of the special concerns associated with, I think, direct testing in that case. Should we think about how that applies here, since we've got a cheerleading squad, the, uh, I think we have to go back to that constitution and I'm sorry, it was not given the language was inappropriate. And my understanding is both that, uh, that language and the power to do that had been delegated by the school board. Well, have you pled that though? Have you pled that? I mean, you gotta, you gotta plead something that plausibly connects up the constitution with the policymaker. So can you point to your, in your pleadings where you think you've pled that? I cannot judge it. I'm not sure. Uh, or at least it may be a Dell. You mentioned delegation. Do you, is, is that the theory? Discuss delegation, uh, in the briefing. And so I think there's some discussion, but you've got to plead it, right? Yes. And then also it was raised in the level one grievance that there was a first amendment violation. I'd like to touch on that just very quickly that the, uh, most of the qualified immunity cases involve police officers who are having to make a split second decision. And the language out of, uh, that we're dealing with is does, this is out of the shower case, which you'd ask about a basis. Does public policy require an exemption of the scope dealing with the, uh, with the qualified immunity, these school board had counsel and they had time. There was no reason for a split second decision. They had a, an ability and public policy would allow them to get a very well-informed decision that they're making. So we'd urge that that ought to be treated differently than a police officer. Yes. What's your best case on the municipal liability nexus? I'd have to supplement. I can't do that. No, that's all right. Okay. Um, and then the second one is, is, do you have a response to the argument that's quite refined that the school district saying is, which is extracurricular activities are just different in kind. They're either like government employees in that context. What, what's your response to that narrowing of their position? There's no basis in any of these decisions that would say that, I mean, there was a cheerleader, uh, was, uh, at a pep rally that, uh, that, uh, Morris was decided it was at a, it was extracurricular to elect people in, in, uh, the Hazelwood case. Uh, the, uh, uh, every one of these cases involves something that had some measure of extracurricular. And I just don't think there's any basis. I mean, the line could be drawn, well, extracurricular activities around student newspapers, extracurricular off campus, uh, we're fine on campus. The editor gets to make the decision on that. Uh, but that's been the distinction all the way through. Very interesting case. Thank you all. Thank you. Um.